UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | * |
| | * |
| | * |
| OLAREWAJU JAMES OLADIPO, | *   Criminal Action No. 22-cr-10062-ADB |
| | * |
| Defendant. | * |
| | * |
| | * |
| | * |
| | * |

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS

BURROUGHS, D.J.

Currently before the Court is Olarewaju James Oladipo's ("Dr. Oladipo") motion to suppress evidence obtained during two searches of Dr. Oladipo's medical offices, one conducted pursuant to a warrant and the other conducted without a warrant.  [ECF No. 51].  Dr. Oladipo also asserts that he is entitled to a Franks hearing because the search warrant application included material omissions and misrepresentations.  [Id.].  For the reasons set forth below, Dr. Oladipo's request for a Franks hearing and his motion to suppress, [ECF No. 51], are both DENIED.

## I.       BACKGROUND

The government began an investigation into Boneguard Orthopedics, P.C. ("Boneguard") and Dr. Oladipo in December 2018, shortly after Dr. Oladipo was terminated from MassHealth as a healthcare provider.  [ECF No. 51-1 ¶¶ 10, 13, 36].

### A.       Search Warrant Application

On August 21, 2019, Agent Christopher Unglaub applied for a warrant to search Suite #3 of Boneguard's offices ("Search Warrant").  See [ECF No. 51-1].  Agent Unglaub's affidavit,

attached to the Search Warrant application ("Affidavit"), <u>see</u> [ECF No. 51-1 at 4–28 ("Aff.")], stated that he had probable cause to believe that Dr. Oladipo had engaged in "criminal activity" by

> [1] illegally dispensing drugs, including Schedule II narcotics, without a legitimate medical purpose and outside the usual course of professional practice, in violation of 21 U.S.C. § 841(a)(l), and [2] committing health care fraud by up-coding the level of medical service provided to patients (i.e. billing insurers for a greater service than was actually provided), in violation of 18 U.S.C. § 1347 [(collectively, the "Target Offenses")].

[Aff. ¶ 14].

Agent Unglaub attested that he also had probable cause to believe that "evidence, fruits, and instrumentalities of the Target Offenses" were located at Suite #3, including records for "patients for whom there is probable cause to believe Dr. Oladipo improperly prescribed opioids" and "patients for whom there is probable cause to believe Dr. Oladipo improperly billed laser therapy." [Aff. ¶ 11].

As more fully set forth below, the Affidavit included information from the following sources: an undercover agent ("UCA") who posed as a patient seeking treatment from Dr. Oladipo, [Aff. ¶¶ 39, 40], an interview with a pharmacist who had stopped filling prescriptions written by Dr. Oladipo for controlled substances, [<u>id.</u> ¶¶ 46–47], interviews with several of Dr. Oladipo's former patients, [<u>id.</u> ¶¶ 48–56], and various prescription and prescriber databases and patient records, [<u>id.</u>¶¶ 23–35].

1.   <u>Controlled Drug Offenses</u>

First, as specifically relevant to the controlled drug offenses, the Affidavit contained information related to several prescription and prescriber databases. [Aff. ¶¶ 23–35]. The Affidavit states that from July 2016 to June 2018, "[Dr.] Oladipo was the 11th highest prescriber

of [morphine milligram equivalents] ('MMEs')[1] of opioids" to Massachusetts residents insured

by the Medicare program, and, in 2018, he was "the top prescriber of MMEs of opioids for

patients insured by . . . MassHealth."  [Id. ¶¶ 24–26].

Agent Unglaub also obtained data from the Massachusetts Prescription Monitoring

Program ("PMP"), a Massachusetts Department of Public Health website that collects all

prescription data for Massachusetts residents from both in-state and out-of-state pharmacies.

[Aff. ¶¶ 27, 27 n.2].  According to the Affidavit, the data shows that between April 2018 and

April 2019, Dr. Oladipo issued 30,880 opioid prescriptions to 2,078 patients.  [Id. ¶ 27].  Agent

Unglaub attested that based on his "training and experience," this volume of prescribing is

"indicative of drug diversion."  [Id.].

The Affidavit further states that "[t]he PMP data also suggests a pattern of reckless

prescribing" because although state regulations have required, since November 2017, that

"prescribers . . . query the PMP database each time prior to prescribing an opioid" to review

patients' full prescription histories, for 121 of his patients, with nearly 2,000 prescriptions in

total, Dr. Oladipo never queried the database.  [Aff. ¶¶ 28–29].  Additionally, Agent Unglaub

attested that the PMP shows that Dr. Oladipo "prescribed dangerous combinations of controlled

substances, and also enabled patients to receive dangerous combinations of controlled substances

from Dr. Oladipo and other prescribers."  [Id. ¶ 30].  Specifically, from 2015 to the time of the

Search Warrant application, Dr. Oladipo prescribed opioids to many ("hundreds") of patients

---

[1] The Affidavit explains that "[t]he medical community has standardized measurements for the
strengths of opioid controlled substances by using the morphine milligram equivalents ('MME')
scale."  [Aff. ¶ 24].

3

who had also been prescribed benzodiazepines, and "at least ten patients" who had also been prescribed benzodiazepines and a muscle relaxant, carisoprodol.  [Id. ¶ 33].[2]

Second, the Affidavit includes information from an audit that purportedly resulted in Dr. Oladipo's termination as a MassHealth prescriber.  [Aff. ¶¶ 36–38].  The Affidavit states that an audit of "patient records and treatment notes that [Dr.] Oladipo generated from July 1, 2015 through June 30, 2016" raised the following concerns related to Dr. Oladipo's prescribing:

   a.  [Dr.] Oladipo's treatment notes used the phrase "no medications on file" in cases when [Dr.] Oladipo himself had issued opioid prescriptions;

   b.  The treatment notes often failed to indicate the dosage or quantity of medication that [Dr.] Oladipo prescribed;

   c.  [Dr.] Oladipo failed to document the basis for prescribing opioid controlled substances, including by failing to document the patient's pain levels;

   d.  [Dr.] Oladipo failed to order drug screens during the review period;

   e.  [Dr.] Oladipo rarely documented attempts to coordinate care with other prescribers, increasing the likelihood that multiple physicians would prescribe opioid controlled substances to the same patient; and

   f.  [Dr.] Oladipo failed to document patients' vital signs.

[Aff. ¶ 37].

Third, with regard to the UC operation, the Affidavit, [Aff. ¶¶ 39–45], states that at the UCA's first visit with Dr. Oladipo, on February 5, 2019, which lasted only eight minutes, the UCA told Dr. Oladipo that he/she had "discomfort" in his/her shoulder from a car accident, [id.

---

[2] The Affidavit lays out that the FDA issued a "Black Box" warning in August 2016 identifying "serious risks of taking opioids along with benzodiazepines or other central nervous system (CNS) depressant medicines" including "unusual dizziness or lightheadedness, extreme sleepiness, slowed or difficult breathing, coma, and death."  [Aff. ¶ 31].  As to carisoprodol, the Affidavit also states that when carisoprodol is taken with opioids and benzodiazepines, this "dangerous cocktail" (known as the "holy trinity") has a "significant relationship to drug overdoses."  [Id. ¶ 32].

¶ 41].  In a footnote, the Affidavit states that "when [Dr.] Oladipo asked the UCA during a later visit whether it was 'the back,' the UCA agreed."  [Id. ¶ 41 n.4].  Dr. Oladipo did not ask about the UCA's medical history, and the only physical examination Dr. Oladipo performed was "asking the UC[A] to raise his/her left arm and lightly touching the UC[A]'s shoulder."  [Id. ¶ 41].  When Dr. Oladipo inquired into whether the UCA had over-the-counter pain medicine, the UCA told Dr. Oladipo that he/she had gotten oxycodone from a co-worker and "felt great" after taking it.  [Id.].  The UCA then asked Dr. Oladipo for an oxycodone prescription, which Dr. Oladipo gave him/her.  [Id.].  The Affidavit notes that Dr. Oladipo informed the UCA that per state regulation he could only prescribe a 7-day supply.  [Id. ¶ 41 n.5].

Dr. Oladipo prescribed the UCA oxycodone three more times: on February 14, March 7, and March 28, 2019.  [Aff. ¶ 42].  The Affidavit states that Dr. Oladipo did not conduct "any physical examination or urine drug screening" during these subsequent visits, and, of the four total times he prescribed oxycodone to the UCA, he only queried the PMP once, on February 14. [Id.].[3]  The Affidavit notes that: (1) during the February 14 visit, the UCA told Dr. Oladipo that ibuprofen was not helping and requested additional oxycodone, and (2) on or about February 19, the UCA requested oxycodone, but Dr. Oladipo refused to issue it, given that he had prescribed a 14-day supply only five days earlier on February 14.  [Id. ¶ 42 nn.6–7].  Additionally, the Affidavit states that "[Dr.] Oladipo rebuffed the UC[A]'s requests to increase the dosage and suggested that he would eventually taper the UC[A]'s daily intake of oxycodone, ultimately declining to issue further prescriptions as of about April 15, 2019."  [Id. ¶ 42 n.8].  Further, "[Dr.] Oladipo . . . declined the UC[A]'s offer to refer him patients."  [Id.].

---

[3] As further discussed below, Dr. Oladipo states that this is inaccurate and that he queried the PMP before he issued the second, third, and fourth prescriptions.

On March 28, the date of the UCA's fourth and final oxycodone prescription from Dr. Oladipo, Dr. Oladipo suggested that he/she get an x-ray.  [Aff. ¶ 43].  At the same visit, the UCA told Dr. Oladipo he/she had been taking oxycodone that he/she had gotten from a friend.  [Id. ¶ 44].  "Dr. Oladipo admonished the UC[A] to stop this practice [but] . . . continued to prescribe oxycodone to the UC[A]."  [Id.].

Fourth, the Affidavit includes information from an interview with Dr. Ben Lee, the attending pharmacist at a CVS pharmacy, in which Dr. Lee explained that he would no longer fill prescriptions written by Dr. Oladipo.  [Aff. ¶¶ 46–47].  On March 28, when the UCA attempted to fill his/her prescription at a CVS pharmacy in Randolph, Massachusetts he/she was informed that the pharmacy would not fill the prescription, and, in fact, no longer filled any prescriptions for controlled substances written by Dr. Oladipo.  [Id. ¶ 46].  During his interview, Dr. Lee stated that several pharmacists at his pharmacy had "expressed concerns about [Dr.] Oladipo's prescribing habits"; that he had "concerns that [Dr.] Oladipo was prescribing high doses of opioid controlled substances with the same directions and diagnoses for several patients"; and that he had noticed that Dr. Oladipo was prescribing opioids to patients who had also been prescribed muscle relaxants and benzodiazepines.  [Id. ¶ 47].  He also noted that [Dr.] Oladipo "approved early prescription refills" and that he "believed that patients choose [Dr.] Oladipo because they can easily obtain prescriptions for controlled substances from him."  [Id.]

Fifth and finally, the Affidavit included information from interviews with former patients of Dr. Oladipo:

- Patient 1 stated that he/she "became addicted to the opioid controlled substances that Dr. Oladipo had prescribed to him/her" and, as a result, took oxycodone for almost two years. [Aff. ¶ 49].  Patient 1 suffered an overdose and eventually stopped using opioids and sought substance abuse treatment "without [Dr.] Oladipo's knowledge or advice."  [Id.].

- Patient 2 went to Dr. Oladipo to get a Percocet prescription because Patient 2 was on probation and "believed that such a prescription would provide an explanation in the event that he/she were drug tested by his/her probation officer." [Aff. ¶ 50]. Patient 2 stated that he/she had a back injury when he/she first went to Dr. Oladipo, but that he/she continued to see Dr. Oladipo after that injury had subsided "because it was easy to get prescriptions from him." [Id.]. Patient 2 stated that Dr. Oladipo "performed a minimal medical evaluation" but continued to give him/her prescriptions in increased dosages. [Id.]. During Patient 2's treatment, Dr. Oladipo told him/her that he would no longer prescribe Percocet and suggested reducing Patient 2's dosage, but when Patient 2 stated that he/she still required the medication, Dr. Oladipo continued prescribing it at the same dosage. [Id.].

- Patients 3 and 4 had previously been prescribed Suboxone by other physicians to treat opioid use disorder ("OUD"). [Aff. ¶ 51]. Although both patients told Dr. Oladipo this, he nevertheless prescribed them oxycodone. [Id. ¶ 52]. Dr. Oladipo in fact told Patient 4 "to stop taking Suboxone because Patient 4 could not take oxycodone and Suboxone simultaneously," and told Patient 3 "to take the oxycodone first, and then restart the Suboxone if he/she ran out of oxycodone." [Id. ¶ 53]. Patient 3 stated that his/her visits with Dr. Oladipo only lasted ten minutes, and that Dr. Oladipo would come into the room for his/her appointment with a new prescription for oxycodone already written out. [Id. ¶ 55].

      2.   <u>Health Care Fraud</u>

As to health care fraud specifically, the Affidavit included the following allegations. When providers bill the Centers for Medicare & Medicaid Services ("CMS") under the Medicare program, they are expected to use Current Procedural Terminology ("CPT") codes to identify the services they performed for their patients. [Aff. ¶¶ 58–59]. During the UCA's initial visit with Dr. Oladipo, Dr. Oladipo suggested that the UCA undergo low-level laser therapy ("LLLT") to treat his/her pain. [Id. ¶ 60]. The Affidavit states that there is no CPT code for LLLT, but that the two CPT codes for "electrical stimulation" may be used "when properly disclosed to the payor." [Id. ¶ 61]. Insurers will generally reimburse one of the two codes for "electrical stimulation" at a higher rate, "but only consider use of that code appropriate when the physician remains in the room for the entire treatment." [Id. ¶ 62]. The UCA's visits with Dr. Oladipo were "surreptitiously videotaped." [Id. ¶ 63]. These videos show that although Dr. Oladipo

billed the UCA's insurer using the higher-rate billing code for each of his/her LLLT sessions, he did not stay in the room during the procedure.  [Id. ¶¶ 63–64].  Dr. Oladipo's notes provided to the insurer also indicated that he "[a]ttended laser," again suggesting he remained in the room when he, in fact, did not.  [Id. ¶ 64].

After the UC operation ended, the government interviewed six former patients for whom Dr. Oladipo had billed insurers using the higher-rate "electrical stimulation" billing code.  [Aff. ¶ 66].  These patients stated that Dr. Oladipo did not stay in the room for these treatments.  [Id.].

Relying on this information, Agent Unglaub sought a warrant for Suite #3, to search for and seize "[f]or the period 01/01/2014 to [8/2019], with regard to [Dr. Oladipo], [Boneguard], or any derivative thereof: "All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of 18 U.S.C. § 1347 and 21 U.S.C. § 841, including" records for over 140 specific patients, billing records, travel and financial records, and all computers. [ECF No. 51-2 at 3–8].

Magistrate Judge Bowler signed the Search Warrant on August 21, 2019.  [Ex. 51-1 at 2].

## B.    Execution of the Search Warrant

The Search Warrant was executed six days later, on August 27, 2019.  [ECF No. 51 at 10].  In an affidavit attached to his motion to suppress,[4] Dr. Oladipo attests that there were at least 12 officers present, and that some wore bulletproof vests and carried guns, which made him feel "scared and nervous."  [ECF No. 51-4 ("Oladipo Aff.") ¶¶ 3–5].  No guns were drawn during the encounter.  [Id. ¶ 4].  When the officers entered the premises, they paired off and interviewed Dr. Oladipo's patients as well as Dr. Oladipo's wife, who was sitting behind the reception desk.  [Id. ¶ 6].  Dr. Oladipo agreed to speak with an officer in a separate office space.

---

[4] Dr. Oladipo chose not to testify at the motion hearing.

[Id. ¶ 7].  This office space, Suite #7, belonged to another business, but Dr. Oladipo used it to store patient records and personal files.  [Id. ¶ 8].  Dr. Oladipo went down to Suite #7 with two officers, unlocked the door for them, and let them in.  [Id. ¶ 9].  Dr. Oladipo and the officers spoke in Suite #7 for an hour before going back upstairs to Suite #3.  [Id. ¶¶ 11–12].  After they had returned to Suite #3, an officer asked Dr. Oladipo to sign a "Consent to Search" form so they could search Suite #7, which Dr. Oladipo did.  [Id. ¶¶ 13–14, 16; ECF No. 51-11].  The single-page form includes four numbered statements:

1.   I have been asked by Special Agents of the Federal Bureau of Investigation to permit a complete search of: [Suite #7 address filled in].

2.   I have been advised of my right to refuse consent.

3.   I give this permission voluntarily.

4.   I authorize these agents to take any items which they determine may be related to their investigation.

[ECF No. 51-11 at 2].  The bottom of the form includes the date of the search and Dr. Oladipo's and Agent Unglaub's signatures.  [Id.].

Dr. Oladipo attests that he recalls an officer using the term "obstruction of justice" and the officer's "demeanor and attitude" made him believe that he would be "accused of obstructing the warrant" if he did not sign the form.  [Oladipo Aff. ¶ 14].  He recalls another officer saying that if he did not sign the form, they would return with a warrant.  [Id.].  Dr. Oladipo attests that he asked if could call his malpractice attorney but was told it would not make a difference.  [Id. ¶ 15].  He further attests that he believed he had no choice but to sign the form.  [Id.].

Officers ultimately seized various documents from Suites #3 and #7, including tax records, bank statements and other financial documents, "communications regarding prescriptions," payroll and employee records, a "Boneguard memo re: Pain Management," and patient files, as well as two computers.  [ECF No. 51-3].

9

### C.      Procedural History

On March 21, 2022, a federal grand jury returned an indictment charging Dr. Oladipo with eleven counts of health care fraud in violation of 18 U.S.C. § 1347.  [ECF No. 1].  He was not charged with any controlled substances offenses.  [Id.].

On April 7, 2023, Dr. Oladipo filed the instant motion to suppress, [ECF No. 51], which the government opposed on May 3, 2023, [ECF No. 56].  The Court heard argument on the motion on June 1, 2023.  See [ECF No. 62].

## II.      SEARCH OF SUITE #3

Dr. Oladipo argues that "all evidence and illegal fruits obtained" from the search of Suite #3 should be suppressed because the Search Warrant was issued without probable cause.  [ECF No. 51 at 12–21].  Dr. Oladipo also argues that the Affidavit contains material misrepresentations and omissions that entitle him to a Franks hearing.  [Id. at 21–29].

### A.      Legal Standard

"A warrant application must demonstrate probable cause to believe that (1) a crime has been committed—the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched—the so-called 'nexus' element."  United States v. Rodrigue, 560 F.3d 29, 32–33 (1st Cir. 2009) (quoting United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005)).  "A finding of probable cause does not demand proof beyond a reasonable doubt."  United States v. Coombs, 857 F.3d 439, 446 (1st Cir. 2017) (citing United States v. Hoffman, 832 F.2d 1299, 1305–06 (1st Cir. 1987)).  Rather, "[i]n determining whether probable cause is established in the affidavit, the magistrate (and the reviewing court) is required to make a practical, common-sense decision whether, given all the circumstances, there is a fair probability that contraband or evidence will be found in the place described."  United States v. White, 766 F.2d 22, 25 (1st Cir. 1985) (citing Illinois v. Gates, 462 U.S. 213 (1983); and then citing United

States v. Drake, 673 F.2d 15, 18 (1st Cir. 1982)).  In making this determination, courts "consider whether the 'totality of the circumstances' stated in the affidavit demonstrates probable cause to search the premises.'"  United States v. Tiem Trinh, 665 F.3d 1, 10 (1st Cir. 2011) (quoting United States v. Barnard, 299 F.3d 90, 93 (1st Cir. 2002)).

Although a search warrant affidavit is presumed valid, United States v. Gifford, 727 F.3d 92, 98 (1st Cir. 2013), where, as here, a defendant asserts that the affidavit contains material misrepresentations and omissions,

> a defendant may rebut this presumption and challenge the veracity of the affidavit in a pretrial hearing, "eponymously called a Franks hearing." . . .  A defendant, however, is not entitled to a Franks hearing as a matter of right. Rather, he first must make a "'substantial preliminary showing' . . . that 'a false statement or omission in the affidavit was made knowingly and intentionally or with reckless disregard for the truth' and that the false statement or omission was 'necessary to the finding of probable cause.'"  When a defendant claims there were material omissions from the facts asserted in an application, he must therefore show that the omission was "intentional or reckless" and that "the omitted information, if incorporated into the affidavit, . . . [is] sufficient to vitiate probable cause."

United States v. Leonard, 17 F.4th 218, 224 (1st Cir. 2021) (second and third alterations in original) (first quoting United States v. Barbosa, 896 F.3d 60, 67 (1st Cir. 2018); then quoting United States v. Arias, 848 F.3d 504, 511 (1st Cir. 2017); and then quoting United States v. Tanguay, 787 F.3d 44, 49 (1st Cir. 2015)).

In conducting this review, "[a] magistrate's 'determination of probable cause should be paid great deference.'"  Gates, 462 U.S. at 236 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969).  A reviewing court's "duty is simply to ensure that the magistrate [judge] had a substantial basis for . . . conclud[ing] that probable cause existed."  United States v. Bregu, 948

F.3d 408, 417 (1st Cir. 2020) (alterations in original) (citations and internal quotation marks omitted).

Because the Court must consider the totality of the circumstances in determining whether there was probable cause for the Search Warrant to issue, the Court addresses Dr. Oladipo's challenges to the probable cause determination and the materiality of his asserted misrepresentations and omissions in tandem.

### B.      Discussion

The Magistrate Judge found that the Search Warrant and supporting Affidavit provided probable cause to believe that the following crimes had been committed and that evidence of those violations would be found at the location to be searched:

### 1.      Controlled Drug Offenses

A DEA-licensed physician violates 21 U.S.C. § 841(a)(l) if they "knowingly prescribe[] a controlled substance outside the usual course of professional medical practice and without a legitimate medical purpose." United States v. Sabean, 885 F.3d 27, 46 (1st Cir. 2018) (quoting United States v. Kohli, 847 F.3d 483, 489 (7th Cir. 2017)) (citing 21 U.S.C. § 841(a)(1); and then citing 21 C.F.R. § 1306.04(a)). "There is no pat formula describing what proof is required to ground a finding that a defendant acted outside the usual course of professional practice. . . . [I]nquiring courts must approach the issue on a case-by-case basis . . . ." Id.

As discussed above, Agent Unglaub included a number of allegations in the Affidavit to support probable cause as to these offenses. Dr. Oladipo isolates and raises issues with individual pieces of information in the Affidavit and claims they do not individually establish probable cause. This may well be true, but, as noted above, that is not the standard the Court applies in reviewing a magistrate's determination of probable cause based on a search warrant affidavit. Rather, the Court must consider the totality of the circumstances. In light of this

standard, the Court finds that the Affidavit provides more than enough information to confirm the magistrate's finding of probable cause:

*Prescriber and Prescription Data.* Dr. Oladipo was one of the highest prescribers of opioids among Medicare patients from July 2016 to June 2018 and the highest among MassHealth patients in 2018. [Aff. ¶¶ 24–26]. Although, as Dr. Oladipo argues, this information may not alone "establish probable cause that that physician is unlawfully dispensing those opioids," [ECF No. 51 at 13–14], it is certainly relevant, see, e.g., United States v. Hindman, No. 07-cr-00096, 2008 WL 2945482, at *2 (E.D. Wash. July 25, 2008) (denying motion to suppress based on the "extensive information contained in the affidavit from various sources," including "evidence that shows that Defendant was the top prescriber of medication in Washington and the second highest prescriber of Oxycodone").[5]

Additionally, since 2017, for more than 120 patients, Dr. Oladipo failed to check the PMP database to evaluate their prescription histories before issuing, in total, over 2,000 opioid prescriptions. [Aff. ¶¶ 28–29]. Dr. Oladipo asserts that the Affidavit excludes "critical context" for this allegation. [ECF No. 51 at 15]. He explains that physicians were not required to check

---

[5] See also United States v. Kraynak, No. 17-cr-00403, 2022 WL 3161907, at *10 (M.D. Pa. Aug. 8, 2022) (noting that defendant was the "top prescriber" of oxycodone and hydrocodone in Pennsylvania over two years, and the "second highest prescriber" the following year, and holding that "[t]hese numbers support the conclusion that [defendant] knew and intended that his prescriptions were issued outside the usual course of his professional practice and without a legitimate medical purpose"); United States v. Li, No. 16-cr-00194, 2022 WL 1445222, at *8 (M.D. Pa. May 6, 2022) (finding "a magistrate judge could reasonably conclude from the information presented [in the search warrant affidavit]," including that "[defendant] was prescribing copious amounts of opioids and that, during some of the relevant time frame, [defendant] was the second largest prescriber of Schedule II controlled substances in Pennsylvania, and the fifth highest prescriber in the country," that defendant's "prescriptions were outside the usual course of professional practice and not for a legitimate medical purpose"), certificate of appealability denied, No. 22-2086, 2022 WL 17424393 (3d Cir. Nov. 30, 2022), cert. denied, 143 S.Ct. 1792 (Mem.) (2023).

the database until late 2016, and, relying on a news article, he asserts that, in the first half of

2017, only 34 percent of physicians who wrote prescriptions checked the database.  [Id. (citing

Matt Stout, Mass. Docs Fail Opioid Rx Checks, Boston Herald (Nov. 8, 2017),

https://www.bostonherald.com/2017/11/08/mass-docs-fail-opioid-rx-checks/)].  That said, Dr.

Oladipo concedes that the same article also states that, at that time, 88 percent of frequent

prescribers of opioids were conducting searches.  [Id.]  Dr. Oladipo cannot reasonably argue that

he was not a frequent prescriber of opioids; he in fact asserts that the number of prescriptions he

issued was "consistent with a busy orthopedic clinic serving a high volume of patients with

chronic and acute pain relating to orthopedic injuries."  [Id. at 14].  Thus, given that nearly 90

percent of similarly high-prescribing physicians were checking the PMP database, the Court

finds that Dr. Oladipo not doing so provides further support that he was prescribing outside the

usual course of professional practice.  Even if it were true that the PMP was not being routinely

checked by other prescribers, the Court would still find this information relevant, although,

again, perhaps not dispositive.

    With regards to the UC investigation, Dr. Oladipo points out that the Affidavit incorrectly

states that he only checked the PMP once, before issuing the UC's second prescription, when

records indicate that he actually reviewed the PMP before issuing the second, third, and fourth

prescriptions.  See [ECF No. 51 at 23 (citing ECF No. 51-7 (PMP Records for UCA))].  This

does not change the fact that Dr. Oladipo did not check the PMP before starting the UCA's

opioid therapy,[6] or, for many other patients, before issuing any of their prescriptions.

    Further, the PMP data shows that Dr. Oladipo was letting patients take a dangerous

_____

[6] The then-current CDC guidelines stated that "[c]linicians should review [PMP] data when
starting opioid therapy for chronic pain and periodically during opioid therapy for chronic pain,
ranging from every prescription to every 3 months."  CDC, CDC Guideline for Prescribing

combination of drugs, by prescribing opioids to "hundreds" of patients who were also prescribed benzodiazepines and a small number of patients who had also been prescribed carisoprodol. [Aff. ¶ 33].  Dr. Lee, the attending CVS pharmacist, noted the same issue.  [Id. ¶ 47].  Dr. Oladipo again asserts that "[t]hese small handfuls of cases, without more information, do not establish probable cause."  [ECF No. 51 at 16].  The Court again finds this information, while not dispositive, is relevant.  See, e.g., United States v. Otuonye, 995 F.3d 1191, 1212 (10th Cir. 2021) (upholding a pharmacist's conviction on a controlled substance offense where "[t]he Government presented testimony from multiple pharmacists that the dosages, pill quantities, and *dangerous drug combinations* [that is, opioids and benzodiazepines] that [a physician] prescribed should have alerted [the pharmacist] that the prescriptions did not have a legitimate medical purpose and were prescribed outside the usual course of professional medical practice" (emphasis added)); United States v. Lague, 971 F.3d 1032, 1040 (9th Cir. 2020) (holding district court properly admitted prescription data that showed "prescriptions of controlled substances in enormous quantities, and *in dangerous combinations*" because the data "support[ed] a reasonable inference that the underlying prescriptions were issued outside the usual course of professional

---

Opioids for Chronic Pain 2016, Morbidity and Mortality Weekly Report (MMWR) (Mar. 18, 2016), http://dx.doi.org/10.15585/mmwr.rr6501e1.

As the Government points out, [ECF No. 56 at 15–16], the CDC currently recommends that physicians check the PMP "[w]hen initiating opioid therapy for acute, subacute, or chronic pain"; "[e]very 3 months or more frequently when continuing opioid therapy"; and "[i]deally . . . before every opioid prescription for acute, subacute, or chronic pain," CDC, Prescription Drug Monitoring Programs, Opioids (Nov. 3, 2022), https://www.cdc.gov/opioids/healthcare-professionals/pdmps.html.

practice and without a legitimate medical purpose" (emphasis added)).[7]

    *MassHealth Audit Results Related to Documentation.*  The MassHealth audit found that Dr. Oladipo "often failed to indicate the dosage or quantity of medication" he prescribed, "failed to document the basis for prescribing opioid controlled substances, including by failing to document the patient's pain levels," and "rarely documented attempts to coordinate care with other prescribers, increasing the likelihood that multiple physicians would prescribe opioid controlled substances to the same patient."  [Aff. ¶ 37].  He was, as a result of this audit, terminated from MassHealth.  [Id. ¶ 36].  Dr. Oladipo avers, once again, that this information is insufficient to establish probable cause.  [ECF No. 51 at 16–17].  He additionally argues that "[t]he findings from that report, as described in the affidavit, indicate at most that Dr. Oladipo was a disorganized and poor documentarian who struggled to keep his clinical paperwork updated."  [Id. at 17].  The Court disagrees.  The fact that Dr. Oladipo failed to appropriately document opioid prescriptions provides still further support for probable cause to believe that an offense was committed.  See United States v. Kraynak, 553 F. Supp. 3d 245, 252 (M.D. Pa. 2021) ("Evidence that demonstrates [defendant] knew of the documentation required in medical records when prescribing controlled substances and knowingly failed to comply with those requirements is . . . direct evidence that [defendant's] conduct was outside the usual course of professional practice and not for a legitimate medical purpose.").

    *Pharmacy No Longer Filling Controlled-Substance Prescriptions Issued by Dr. Oladipo.*
The Affidavit states that a CVS pharmacy stopped filling prescriptions written by Dr. Oladipo

---

[7] See also Li, 2022 WL 1445222, at *8 (finding that defendant's "penchant for 'trinity prescribing' which had almost no legitimate medical purpose, was dangerous, and generally only served to increase the high provided by opioids," was relevant to the determination that defendant's "prescriptions were outside the usual course of professional practice").

because the attending pharmacist had concerns about his prescribing practices.[8]  [Aff. ¶¶ 46–47].
The allegedly exculpatory statements that Dr. Oladipo claims that were omitted from the
Affidavit do not diminish the relevance of this information.[9]

     *Information About Dr. Oladipo's Treatment Practices.*  According to the Affidavit, Dr.
Oladipo failed to conduct an adequate physical examination, order imaging, and/or review
medical records before prescribing opioids to the UCA, and visits with the UCA and Patient 3
lasted ten minutes or less.  [Aff. ¶¶ 41–42, 55]; see, e.g., United States v. Zolot, 968 F. Supp. 2d
411, 429 (D. Mass. 2013) ("Courts have upheld convictions [in § 841 cases] where there was
sufficient evidence of physician behavior that demonstrated prescription without legitimate
medical purpose and outside the bounds of professional practice, including . . . [in] United States
v. Kaplan, 895 F.2d 618, 620–21 (9th Cir. 1990)[,] . . . where physician-defendants'

---

[8] See Hindman, 2008 WL 2945482, at *2 (E.D. Wash. July 25, 2008) (crediting as relevant to
finding probable cause "information from a pharmacist about [defendant's] unusual prescribing
habits").

[9] Dr. Oladipo states that key portions of the interview are omitted, including the pharmacist's
statements that:

- He "queries the [PMP] database often and did not recall having a suspicion that Oladipo's
  patients were doctor/pharmacy shopping."  [ECF No. 51 at 26 (quoting ECF No. 51-8
  (Interview with Dr. Lee))].

- He "has never had to call the police regarding Oladipo's patients," that he could not
  "recall a time when he was concerned about an Oladipo patient being under the influence
  of a narcotic," and that "he did not know if any of Oladipo's patients had overdosed."
  [Id.]

- His impression of Oladipo was that "he is not concerned about his patients and not that he
  is implicitly involved in the diversion of controlled substances."  [Id.]

Finally, Dr. Oladipo states that the Affidavit omitted that the pharmacist had discussed "at least
one former patient of Dr. Oladipo who went on to receive the same opioids from another
physician," thereby suggesting that Dr. Oladipo's prescribing was not outside of the course of
usual medical practice.  [ECF No. 51 at 26].

prescriptions were issued without physical examination or medical history, and where defendant issued up to 21 prescriptions in a month");[10] United States v. Oti, 872 F.3d 678, 688 (5th Cir. 2017) (finding "evidence at trial was . . . sufficient to support [defendant's] conviction that he knew of and willfully participated in a pill mill scheme," where, in addition to other evidence, "[v]ideo footage and witness testimony presented at trial established that [defendant's] patient visits usually lasted less than eight minutes, often lasting less than four minutes"). Further, the MassHealth audit found that Dr. Oladipo had failed to order drug screenings, "failed to document patients' vital signs," and rarely documented efforts to coordinate care with other physicians. [Aff. ¶ 37].

Finally, Dr. Oladipo prescribed opioids to several patients with histories of opioid addiction, and even encouraged them to stop taking Suboxone, which had been prescribed to them to treat OUD. [Aff. ¶¶ 51–53].

There is also information that does not necessarily support probable cause. For example, as noted in the Affidavit, Dr. Oladipo provided treatments to the UCA beyond just prescribing opioids. [Aff. ¶¶ 60, 63–64].[11] Dr. Oladipo also points out that the Affidavit omits that he similarly provided other treatments to Patients 1 and 2, including injections and knee braces for Patient 1 and back braces and an ointment for Patient 2. [ECF No. 51 at 27, 29 (citing ECF Nos.

---

[10] See also United States v. Sabean, 885 F.3d 27, 48 (1st Cir. 2018) (crediting evidence that physician never examined patient before issuing various prescriptions, in finding there was sufficient evidence to sustain conviction on controlled substance offense); United States v. Chaney, 921 F.3d 572, 591 (6th Cir. 2019) (upholding § 841 conviction where, among other evidence, patient testified that "he was prescribed Percocet on his first visit to the clinic [and] that he was physically examined only once").

[11] Dr. Oladipo asserts that that the Affidavit omits that he provided the UCA treatment other than oxycodone. [ECF No. 51 at 23]. This is incorrect: in the context of the health care fraud offenses, the Affidavit states explicitly that Dr. Oladipo provided the UCA LLLT. See [Aff. ¶¶ 60, 63–64].

51-9 (Patient 1 Interview), 51-10 (Patient 2 Interview))].  Dr. Oladipo further notes that the Affidavit omits that he evaluated and reviewed the medical history of some patients, including Patient 1, and ordered drug screenings for some patients, including Patient 2.  [Id. at 27–28 (citing ECF Nos. 51-9, 51-10)].

Further, Dr. Oladipo declined to provide an oxycodone prescription to the UCA on one occasion; declined to increase the dosage he prescribed; after four prescriptions, stopped prescribing oxycodone to the UCA; and declined to accept referrals from the UCA.  [ECF No. 51 at 24–25; Aff. ¶ 42 nn.7–8].[12]  Dr. Oladipo notes that the Affidavit omits other details of the UC operation, including that (1) he prescribed the UCA a lower dose of oxycodone, relative to the maximum dose recommended by the CDC, [ECF No. 51 at 24 (citing CDC Guideline for Prescribing Opioids for Chronic Pain (2016))]; (2) he began to express concerns about the UCA's dependency on oxycodone during his/her second visit; (3) he only prescribed the UCA oxycodone during four of their six visits; and (4) during the March 28 visit, when he prescribed the UCA his/her last oxycodone prescription, he told the UCA to get an x-ray if he/she continued to experience pain.  [ECF No. 51 at 23–25, 24 n.4].[13]

---

[12] Dr. Oladipo takes issue with the fact that the Affidavit included this information in footnotes rather than in the above-line text.  [ECF No. 51 at 24].  It is not clear whether Dr. Oladipo is implying that placing information in footnotes somehow signals it is less important, that the Magistrate Judge would not have read the footnotes, or something else.  Regardless, the Court will not dictate how information in a search warrant should be presented or presume that information in footnotes would not be thoroughly reviewed by the Magistrate Judge.

[13] Dr. Oladipo also avers that the Affidavit suggests that although the UCA told Dr. Oladipo that his purported injury was in his/her shoulder during his/her first visit, Dr. Oladipo mistakenly thought that the injury was in the UCA's back during later visits.  [ECF No. 51 at 22–23].  Dr. Oladipo points out that the UCA said that he/she had more generalized pain in his/her back both in his/her intake questionnaire and during their visits.  [Id.].  Thus, in Dr. Oladipo's view, his stated understanding that the UCA's injury/"problem area" was his/her back, including his/her shoulder, was not incorrect, and the Affidavit misleadingly suggests otherwise.  [Id.].  The Court

Additionally, although Dr. Oladipo did prescribe Patient 1 oxycodone for 2 to 3 years, the Affidavit omits that he did not increase the dosage when Patient 1 requested it, and that, although Patient 1 entered substance abuse treatment without Dr. Oladipo's knowledge or advice, Dr. Oladipo was "happy to hear that [Patient 1] wanted to get off the oxycodone prescription."  [ECF No. 51 at 27 (quoting ECF No. 51-9)].  Dr. Oladipo also points out that the Affidavit omits that he told Patient 2 that Percocet was "highly addictive" and "did not want to continue prescribing [him/her] the medication."  [Id. at 28–29 (quoting ECF No. 51-10)].  Nevertheless, Dr. Oladipo continued to prescribe Patient 2 Percocet.  [Aff. ¶ 50].[14]

Taking all information into consideration, including Dr. Oladipo's contentions as to information that was omitted and/or misrepresented, the Court finds that the allegations in the Affidavit demonstrate: that Dr. Oladipo was one of the top prescribers of opioids to both Massachusetts Medicare and Medicaid patients for several years; that he failed to check over 120 patients' prescription histories in the PMP database at a time when he himself asserts 90 percent

---

finds that this omission does not vitiate probable cause and in fact highlights that Dr. Oladipo's treatment was not tied to a physical examination.

[14] Dr. Oladipo also states that, contrary to the notes from the Patient 2 interview, the Affidavit misleadingly suggests that Patient 2 sought out Dr. Oladipo specifically as a physician that would prescribe him/her Percocet.  The Affidavit states "Patient 2 told me that he/she sought out prescriptions for Percocet from [Dr.] Oladipo, because he/she was on probation and needed a prescription drug, and believed that such a prescription would provide an explanation in the event that he/she were drug tested by his/her probation officer."  [Aff. ¶ 50].  While Dr. Oladipo's interpretation is possible, the Court finds that the more natural reading is Patient 2 went to a physician, in this case Dr. Oladipo, with the specific aim of getting a Percocet prescription, not that he/she specifically targeted Dr. Oladipo to get that prescription.  Regardless, Dr. Oladipo does not contest the similar allegation that Patient 2 stated he/she continued to see Dr. Oladipo because "it was easy to get prescriptions from him."  [Id.]; see also [ECF No. 51-10 at 3 ("Even though [Patient 2] began seeing [Dr. Oladipo] due to [his/her] back injury, [Patient 2] continued seeing [Dr. Oladipo] because it was easy to get . . . Percocet prescriptions.")].  Additionally, Dr. Oladipo states that the Affidavit omits that "Patient 2 stated that he/she 'loved Dr. O' and 'considered him a good man.'"  [ECF No. 51 at 28].  The Court does not find this is relevant to the probable cause analysis.

of physicians who similarly prescribed high numbers of opioids were checking the database; that he prescribed opioids to patients who had also been prescribed benzodiazepines and carisoprodol; that a MassHealth audit raised serious concerns related to his documentation of opioid prescriptions and other treatment practices and that MassHealth ultimately terminated him; that a CVS pharmacy had stopped filling his controlled substance prescriptions based on a pharmacist's concerns about his prescribing practices; that he issued four oxycodone prescriptions to a UCA after doing a minimal physical examination and without any imaging; that his patient visits could last ten minutes or less; and that he prescribed oxycodone to patients who he knew had been treated for opioid abuse disorder.

While Dr. Oladipo also provided patients other treatments, and in some cases expressed concerns about prescribing opioids, declined to increase dosages, and stopped prescribing, the Court nevertheless finds, based on the totality of these circumstances, that there is a substantial basis to conclude probable cause existed as to the controlled substances offenses.

Further, Dr. Oladipo has not shown that any information that may have been misrepresented in the Affidavit was necessary to a finding of probable cause, or that any omissions were sufficient to negate probable cause.  Leonard, 17 F.4th at 224.  As a result, the Court finds that Dr. Oladipo is not entitled to a Franks hearing.[15]

       2.    Health Care Fraud

"A defendant violates 18 U.S.C. § 1347 if she 'knowingly and willfully execute[s] a scheme [intended] to defraud a government health-care program.'"  United States v. Troisi, 849

---

[15] Although the Court need not reach the other prong of the Franks analysis, that is, whether any misrepresentations or omissions were knowing, intentional, or done with reckless disregard for the truth, Leonard, 17 F.4th at 224, the Court finds that Dr. Oladipo failed to make this preliminary showing as well.  The government states that the Affidavit's misrepresentation that Dr. Oladipo checked the PMP database once, rather than three times, before prescribing

F.3d 490, 494 (1st Cir. 2017) (alterations in original) (quoting United States v. Iwuala, 789 F.3d 1, 12 (1st Cir. 2015)).  So-called "upcoding," that is, "using improper billing and coverage codes in order to obtain higher reimbursement rates," United States ex. rel. Kelly v. Novartis Pharms. Corp., 827 F.3d 5, 9 n.6 (1st Cir. 2016), may constitute healthcare fraud, see, e.g., United States v. Janati, 237 Fed. App'x 843, 845 (4th Cir. 2007) ("[Defendants] defrauded Medicare and private insurance companies, overbilling them in three ways[,] [including that] . . . they

---

oxycodone to the UCA, was the result of a mistaken belief that the data they received in April 2019 extended through April 2019, rather than stopping in February 2019.  [ECF No. 56 at 15]. Dr. Oladipo has presented no information to refute this explanation, and, even assuming that such a belief was negligent, that single mistake is not enough to trigger a Franks hearing. Tanguay, 787 F.3d at 52 ("[T]he Supreme Court in Franks gave no guidance concerning what constitutes a reckless disregard for the truth in fourth amendment cases, except to state that negligence or innocent mistake [is] insufficient" (internal quotation marks and citations omitted)).

Further,

> [b]ecause there is no requirement that every shred of known information be
> included in a warrant affidavit, the omission of a particular detail, without more, is
> not enough to satisfy the mens rea element of the Franks test.  Rather, an omission
> triggers the exclusionary rule only if it is designed to mislead, or made in reckless
> disregard of whether [it] would mislead, the magistrate in his appraisal of the
> affidavit.

Tanguay, 787 F.3d at 49 (internal quotation marks and citations omitted) (cleaned up).  The Court finds that Dr. Oladipo failed to make any such showing as to the alleged omissions, particularly where, as discussed above, the Affidavit did include a number of potentially exculpatory allegations.  See, e.g., [Aff. ¶ 42 n.7 ("On or about February 19, 2019, the UC[A] requested an additional prescription, which [Dr.] Oladipo declined to issue, because he had issued a 14-day prescription on February 14, 2019."); id. ¶ 42 n.8 ("Although [Dr.] Oladipo continued to prescribe oxycodone to the UC[A], for approximately two months, [Dr.] Oladipo rebuffed the UC[A]'s requests to increase the dosage and suggested that he would eventually taper the UC[A]'s daily intake of oxycodone, ultimately declining to issue further prescriptions as of about April 15, 2019. [Dr.] Oladipo also declined the UC[A]'s offer to refer him patients."); id. ¶ 50 ("Some time into his/her treatment, [Dr.] Oladipo told Patient 2 that [Dr.] Oladipo did not want to continue prescribing Percocet to Patient 2, and suggested lowering his/her dosages.")].

'upcoded' office visits, meaning that when they billed insurers, they represented that an office

visit was more involved or complex than it actually was, justifying a higher billing rate.").

Dr. Oladipo argues that the information in the Affidavit about "coding decisions for

seven of [his] patients do[es] not establish probable cause that [he] had committed or was

engaged in a criminal scheme to defraud that would justify the expansive search agents sought to

undertake," particularly given the Affidavit's concession that there is "systemic uncertainty

regarding coding for LLLT administration."  [ECF No. 51 at 20].  The Government responds that

Dr. Oladipo takes an overly narrow view of the relevant allegations and that the Court must

consider all of the allegations in the Affidavit, including those related to Dr. Oladipo's

prescribing practices, rather than just those related to Dr. Oladipo's billing for LLLT.  [ECF No.

56 at 12].  The Government further argues that, even if the Court limits its review to these

allegations, they provide a sufficient basis for a broader search of his patient records.  [Id.].

The Court agrees with the Government on both counts.  Where, as here, the specific

patient records listed in the Search Warrant were identified as either "patients for whom there is

probable cause to believe [Dr.] Oladipo improperly prescribed opioids" or "patients for whom

there is probable cause to believe [Dr.] Oladipo improperly billed laser therapy," [Aff. ¶ 11], the

Court finds it is appropriate to consider all the allegations in the Search Warrant.  Additionally, a

relatively small number of patient records can provide probable cause for a broader search, see,

e.g., United States v. Hayes, 794 F.2d 1348, 1355–57 (9th Cir. 1986) (finding that even though

affidavit only contained information about 58 patients, warrant was not overbroad in authorizing

the search of over 10,000 patient files at a medical practice, because "known cases could fairly

be considered as representative of more pervasive violations.").  The Court finds there was

probable cause to issue the Search Warrant as to the health care fraud offenses.

### III.      SEARCH OF SUITE #7

Dr. Oladipo next argues that evidence obtained in the warrantless search of Suite #7 should be suppressed because the government cannot prove that Dr. Oladipo voluntarily consented to the search.  [ECF No. 51 at 29–31].[16]

#### A.      Legal Standard

"[A] warrantless search may be conducted with the voluntary consent of a person authorized to give such consent."  United States v. Chaney, 647 F.3d 401, 405−06 (1st Cir. 2011) (citing United States v. Stierhoff, 549 F.3d 19, 23 (1st Cir. 2008)).  The touchstone of involuntariness is "whether the will of the defendant [was] overborne," which requires a court to consider the "totality of the circumstances."  Bryant v. Vose, 785 F.2d 364, 367–68 (1st Cir. 1986) (quoting Procunier v. Atchley, 400 U.S. 446, 453 (1971)) (further citations omitted). "When evaluating the totality of the circumstances, an inquiring court must look for evidence of coercion, duress, confusion, and the like."  Coombs, 857 F.3d at 449 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973)).  Courts may consider "the person's 'age, education, experience, intelligence, and knowledge of the right to withhold consent.'"  United States v. Ramdihall, 859 F.3d 80, 89 (1st Cir. 2017) (quoting United States v. Forbes, 181 F.3d 1, 6 (1st Cir. 1999)).  The Court also weighs "whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances."  United States v. Howard, 66 F.4th 33, 47 (1st Cir. 2023) (citation omitted).  The government bears the burden of demonstrating valid consent by a preponderance of the evidence.  See Forbes, 181 F.3d at 5.

---

[16] Dr. Oladipo also argued, in the alternate, that evidence from Suite #7 should be suppressed as fruit of the unlawful search of Suite #3.  [ECF No. 51 at 32–33].  Because the Court finds that the search of Suite #3 was lawful, it will not address this argument.

**B.**     **Discussion**

Dr. Oladipo signed a "Consent to Search" form, which indicated that he "ha[d] been advised of [his] right to refuse consent" and "g[a]ve [his] permission voluntarily." [ECF No. 51-11]. Dr. Oladipo nevertheless argues that his consent was not voluntary because the events that preceded his signing the form were "inherently coercive," including that a large number of armed officers wearing bulletproof vests came to his office to conduct the search of Suite #3, that those officers "fanned out" to question his patients, and that he was subjected to a long interview prior to being asked to sign the form. [ECF No. 51 at 10–11, 31]. Dr. Oladipo also attests that he was not informed orally that he could refuse consent, [id. at 31], and that he did not believe he could, based on: (1) the fact that an agent used the term "obstruction of justice"; (2) the "demeanor and attitude" of that agent made him feel "under threat of being accused of obstructing the warrant"; and (3) another agent stated that if he did not sign, they would return with a warrant, [Oladipo Aff. ¶ 14].

The Government responds that "[t]he evidence before the Court establishes that [Dr. Oladipo] [signed a consent form] knowingly and voluntarily." [ECF No. 56 at 23]. Specifically, the Government argues that given his education level, Dr. Oladipo would have read and understood the form before signing. [Id.]. Additionally, in the Government's view, "[Dr.] Oladipo was in an appropriate mental state to provide consent" given that more than an hour elapsed between the time the officers entered his offices and asked him to sign the consent form, and during that time he "voluntarily answered numerous questions that investigators posed." [Id.]. Further, an agent using the term "obstruction of justice," particularly when Dr. Oladipo "is unable to provide the Court with the agent's full statement or its context," "does not come close to showing coercion that might vitiate [Dr.] Oladipo's consent." [Id.].

The Court finds that the preponderance of the evidence supports a finding of voluntariness.  While the presence of a large number of officers at his place of work and a reference to "obstruction of justice" very likely felt intimidating, given the length of time that passed, that no weapons were drawn, and there were no physical threats, these circumstances do not meet the "high bar" for coercion in this context.  United States v. Reyes Reyes, 475 F. Supp. 3d 27, 38 (D. Mass. 2020) ("Without some showing of threat of physical force or intimidation, it is a high bar otherwise to prove the existence of an unduly coercive environment in which a defendant consents to a search" (citing Ramdihall, 859 F.3d at 89)).  Courts have found consent to be voluntary in far more coercive circumstances, even when defendants have already been arrested.  See Coombs, 857 F.3d at 449 (finding that defendant's written consent to a search while in custody was voluntary, given that "more than twenty minutes elapsed between the [defendant's] arrest and his consent to the search"; he "appeared cooperative and lucid throughout, even if a bit 'nerved up'"; and "no officer's weapon was drawn and no threats were uttered").  Additionally, officers stating they would return with a warrant is not itself coercive. See United States v. Lee, 317 F.3d 26, 33 (1st Cir. 2003) ("Courts have held, with a regularity bordering on the monotonous, that this sort of statement, [that if a person does not consent to a search, officers would return with a warrant], made in a case in which the facts were sufficient to support the issuance of a search warrant, does not constitute coercion" (citations omitted)).

Further, "it is not essential that . . . officers first inform the consenting party of the right to withhold consent," United States v. Barnett, 989 F.2d 546, 555 (1st Cir. 1993), and, here, although officers may not have orally informed Dr. Oladipo, the Consent to Search form included a clear reference to his "right to refuse consent," [ECF No. 51-4 a 2].  The Court also finds that Dr. Oladipo's age and education-level both counsel in favor of voluntariness.

Finally, the Court declines to credit Dr. Oladipo's attestations as to the "demeanor and attitude" of the agents or his subjective belief that he had no choice but to sign the Consent to Search form. "The Court gives little weight to [the defendant's] affidavit in the absence of live testimony in open court," United States v. Villot-Santiago, 618 F. Supp. 3d 35, 42 (D. Mass. 2022) (citing United States v. Phillipos, 849 F.3d 464, 469 (1st Cir. 2017)), because it does not "allow the government to test [his attestations] through cross-examination," Phillipos, 849 F.3d at 469. See also United States v. Baskin, 424 F.3d 1, 3 (1st Cir. 2005) (affirming denial of a motion to suppress in the context of a defendant who declined to testify, holding that district court was entitled to find that defendant's affidavit was alone insufficient to "establish any ground for asserting a Fourth Amendment right" (citations omitted)); Phillipos, 849 F.3d at 469 (holding that district court did not abuse its discretion in finding that defendant's affidavit on its own failed to establish a "sufficient threshold showing of a factual dispute," related to the voluntariness of his confession, to entitle him to an evidentiary hearing (citing Baskin, 424 F.3d 1)).

Considering the totality of the circumstances, the Court concludes that the Government has shown by a preponderance of the evidence that Dr. Oladipo's consent to the search of Suite #7 was voluntary. The Court therefore declines to suppress evidence on this basis.

## IV.       CONCLUSION

For the reasons set forth above, Dr. Oladipo's request for a Franks hearing and his motion to suppress evidence from the searches of Suites #3 and #7, [ECF No. 51], are DENIED.

**SO ORDERED.**

July 14, 2023                                               /s/ Allison D. Burroughs
                                                            ALLISON D. BURROUGHS
                                                            U.S. DISTRICT JUDGE