UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| v. | * | |
| OLAREWAJU JAMES OLADIPO, | * | Criminal Action No. 22-cr-10062-ADB |
| Defendant. | * | |

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

On December 12, 2023, a jury found Olarewaju James Oladipo ("Dr. Oladipo") guilty of

ten counts of health care fraud.  [ECF No. 134].  Currently before the Court is Dr. Oladipo's

post-trial motion for an order permitting his counsel to speak with Juror #4 regarding potential

juror misconduct, or in the alternative, for the Court to conduct an investigation regarding

potential juror misconduct.  [ECF No. 148].  For the reasons set forth below, the motion is

DENIED.

## I.        BACKGROUND

On March 21, 2022, a grand jury returned an indictment against Dr. Oladipo, charging

him with eleven counts of health care fraud.  [ECF No. 1].  His case was tried to a jury over two

weeks, beginning on November 27, 2023.  See [ECF Nos. 114–15, 120–22, 127–30].  The

Defense rested and the case was submitted to the jury on Thursday, December 7, 2023.  See

[ECF No. 130].  On Thursday and Friday, the jury sent five notes to the Court, with substantive

1

questions (e.g., "The jury is wondering if we should put any weight behind the visits in evidence but not charged for patient Danilo Santos?"), and requests for exhibits and transcripts of specific witnesses' testimony, which the Court provided.  <u>See</u> [ECF No. 135].  On Monday, December 11, the jury sent a sixth note to the Court, stating: "We are not making any progress today.  And people's opinion [sic] are not being swayed by our debates.  How can we proceed?"  [<u>Id.</u> at 5].  After hearing from the parties, and making one change at Dr. Oladipo's request, the Court gave the jury a modified <u>Allen</u> charge, based on the First Circuit's pattern instruction.  Dr. Oladipo did not object to this charge.  The following day, December 12, the jury returned a verdict, finding Dr. Oladipo guilty on ten of the eleven charged counts.  [ECF No. 134].  After the verdict was announced, the Court polled the jury and each juror confirmed that this was their verdict.

As further discussed below, in the days after the jury returned its verdict, Juror #4 communicated, through a letter to the Court; a social media message to one of Dr. Oladipo's expert witnesses; and several public social media posts, that she now disagreed with the verdict and also alleging issues with the deliberation process.  [ECF Nos. 138, 148-2, 148-3].  Additionally, Dr. Oladipo filed an affidavit from Kevin Rickel, an investigator that assisted defense counsel with this case, in which Rickel stated that Dr. Oladipo informed him that Dr. Oladipo's friends had seen two jurors socializing at a bar close to the courthouse after deliberations on Monday, December 11.  [ECF No. 148-1 ("Rickel Affidavit" or "Rickel Aff.")].  Dr. Oladipo's friends told Rickel that it was Juror #4 and a male juror who they saw socializing.  [<u>Id.</u>].  Dr. Oladipo also noted in reply that he has obtained surveillance video of Juror #4 and the other juror (who he believes to be Juror #3) sitting at the bar for forty-five minutes after Court that day, [ECF No. 158 at 2 n.1], but has not provided that video to the Court.

## II.        LEGAL STANDARD

"Where a defendant makes a colorable or plausible claim of jury taint or juror

misconduct, the district court has an obligation to investigate it."  United States v. Burhoe, 875

F.3d 55, 57 (1st Cir. 2017) (citing United States v. Zimny, 846 F.3d 458, 464 (1st Cir. 2017)).

That said, "long-recognized and very substantial concerns support the protection of jury

deliberations from intrusive inquiry."  Tanner v. United States, 483 U.S. 107, 127 (1987).

> There is little doubt that postverdict investigation into juror misconduct would in
> some instances lead to the invalidation of verdicts reached after irresponsible or
> improper juror behavior.  It is not at all clear, however, that the jury system could
> survive such efforts to perfect it.  Allegations of juror misconduct, incompetency,
> or inattentiveness, raised for the first time days, weeks, or months after the verdict,
> seriously disrupt the finality of the process.  Moreover, full and frank discussion in
> the jury room, jurors' willingness to return an unpopular verdict, and the
> community's trust in a system that relies on the decisions of laypeople would all be
> undermined by a barrage of postverdict scrutiny of juror conduct.

Id. at 120–21 (internal citations omitted).

Thus, "[c]ourts generally 'should be hesitant[] to haul jurors in after they have reached a

verdict . . . to probe for potential instances of bias, misconduct, or extraneous influences.'"

United States v. Connolly, 341 F.3d 16, 34 (1st Cir. 2003) (quoting Neron v. Tierney, 841 F.2d

1197, 1205 (1st Cir. 1988)).  "A court should only conduct such an inquiry when 'reasonable

grounds for investigation exist,' i.e., 'there is clear, strong, substantial and incontrovertible

evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced

the trial of a defendant.'"  Connolly, 341 F.3d at 34 (quoting United States v. Moon, 718 F.2d

1210, 1234 (2d Cir. 1983)).

In evaluating a defendant's claim of jury taint or juror misconduct, the Court is limited in

the materials it can review by Federal Rule of Evidence 606(b), which "codifies the 'near-

universal and firmly established common-law rule' that prohibits the admission of juror

3

testimony [or other juror evidence] to impeach a jury verdict."  <u>Connolly</u>, 341 F.3d at 34

(quoting <u>Tanner</u>, 483 U.S. at 117).  "There are significant policy considerations underlying such

a rule, including finality, maintaining the integrity of the jury system, encouraging frank and

honest deliberations, and the protection of jurors from subsequent harassment by a losing party."

<u>Id.</u> (citing <u>McDonald v. Pless</u>, 238 U.S. 264, 267–68 (1915)).

      Rule 606(b) provides that "[d]uring an inquiry into the validity of a verdict or indictment,

a juror may not testify about any statement made or incident that occurred during the jury's

deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental

processes concerning the verdict or indictment.  The court may not receive a juror's affidavit or

evidence of a juror's statement on these matters."  Fed. R. Evid. 606(b)(1).  That said, as Dr.

Oladipo argues is relevant here, the Rule makes exceptions for testimony (or other evidence)

concerning whether "extraneous prejudicial information was improperly brought to the jury's

attention," and whether "an outside influence was improperly brought to bear on any juror."

Fed. R. Evid. 606(b)(2).  "Juror testimony about a matter characterized as 'external' to the jury is

admissible under Rule 606(b), while testimony about 'internal' matters is barred by the Rule."

<u>United States v. Villar</u>, 586 F.3d 76, 83 (1st Cir. 2009) (citing <u>Tanner</u>, 483 U.S. at 117–18

(1987)).  "Information is 'extraneous' if derived from a source 'external' to the jury.  'External

matters include publicity and information related specifically to the case the jurors are meant to

decide.'"  <u>Bebo v. Medeiros</u>, No. 14-cv-11872, 2017 WL 6551276, at *2 (D. Mass. Nov. 13,

2017) (quoting <u>Warger v. Shauers</u>, 574 U.S. 40, 51 (2014)), <u>aff'd</u>, 906 F.3d 129 (1st Cir. 2018),

<u>cert. denied</u>, 139 S. Ct. 1203 (2019)  Additionally, the First Circuit has held that courts may, in

their discretion, "inquire into the validity of [a] verdict by hearing juror testimony to determine

whether ethnically biased statements were made during jury deliberations and, if so, whether

there is a substantial probability that any such comments made a difference in the outcome of the trial." Villar, 586 F.3d at 87.

## III.    DISCUSSION

Dr. Oladipo argues there may have been juror misconduct that warrants investigation. See [ECF No. 148].  Specifically, Dr. Oladipo asserts there is evidence, including Juror #4's communications and the Rickel Affidavit, that suggests that there was "improper pressure, coercion, and even possible racial or ethnic bias during deliberations," [ECF No. 148 at 5]; "discussion of the case outside the presence of the other deliberating jurors, as well as the possibly of outside influence being brought to bear on Juror #4," based on a one-on-one conversation with another juror outside the courthouse, [id. at 5]; and "[o]utside influence," in the form of a "story" that "Dr. Oladipo's practice was a scheme based on high volume patients in order to prescribe high amounts of opioids in a deliberate cycle of falsified notes to [de]fraud the health insurance system," [ECF No. 158 at 2–3].  As further discussed below, the Court finds that nothing in Juror #4's post-verdict communications, the Rickel Affidavit, or anything else raised by Dr. Oladipo constitutes "reasonable grounds for investigation" into the verdict. Connolly, 341 F.3d at 34 (citation omitted).

To begin, Juror #4's assertions related to the pressure she felt as a result of other jurors' name-calling and bullying during deliberations fall squarely in Rule 606(b)'s prohibition against juror testimony related to "any statement made or incident that occurred during the jury's deliberations" and "the effect of anything on that juror's or another juror's vote."  Fed. R. Evid. 606(b); see Mahoney v. Vondergritt, 938 F.2d 1490, 1491, 1493 (1st Cir. 1991) (describing "pressure[]" and "badger[ing]" as concerns that "center[] entirely on the jury's internal processes rather than on any external influence . . . [and therefore] provide neither a basis for inquiry nor

grounds for undermining a verdict"); see also United States v. McGhee, 532 F.3d 733, 741 (8th Cir. 2008) (holding that "jurors . . . were not competent to testify about alleged intimidation by other jurors as this goes to how the verdict was reached. . . . [and] [t]he district court did not abuse its discretion in denying a hearing on this issue").  The Court cannot consider these statements by Juror #4 and they therefore do not provide a basis for post-verdict inquiry.

The Court also finds that Juror #4's assertions regarding another juror seeking her out in the hallway during deliberations similarly concern the "jury's internal processes," not "external influence," and do not "provide . . . a basis for inquiry []or grounds for undermining [the] verdict."  Mahoney, 938 F.2d at 1493 (concluding juror's allegations, including that "some jurors discussed the merits of the case prior to the commencement of deliberations," did not warrant investigation); United States v. Dyal, No. 09-cr-01169, 2010 WL 2854292, at *14 (D.S.C. July 19, 2010) ("Absent discussion of extraneous material or information, any 'misconduct' inherent in deliberations with fewer than all jurors present constitutes intrinsic misconduct which is beyond the scope of proper judicial inquiry." (first citing Fed. R. Evid. 606(b); and then citing Robinson v. Polk, 438 F.3d 350, 363 (4th Cir. 2006))); see also United States v. Felton, 239 F. Supp. 2d 122, 128 (D. Mass. 2003) (finding letter from an alternate juror raising several issues, including premature deliberations, "concern[ed] intra-jury affairs of a character that does not justify post-trial investigation under Rule 606(b) and relevant case law").  Likewise, the statements of Dr. Oladipo's friends in the Rickel Affidavit, relating to seeing Juror #4 socializing with another juror outside of the courthouse between the first and second day of deliberations, appear to be hearsay and thus of questionable reliability.  See Fed. R. Evid. 801(c).  Even assuming these statements were accurate, and that the surveillance video shows Jurors #3 and #4 socializing, as just discussed, any inquiry into this issue would require soliciting testimony from

jurors as to the nature of these alleged individual conversations with Juror #4, which is information "internal" to deliberations and is therefore barred by Rule 606(b). See supra. Moreover, the Court is not aware of any prohibition on jurors socializing during deliberation and will not impute improper conduct to a seemingly innocent and permissible social interaction.

As to Juror #4's assertion that the "story" "exclaimed" by one juror (namely, that "Dr. Oladipo's practice was a scheme based on high volume patients in order to prescribe high amounts of opioids in a deliberate cycle of falsified notes to fraud the health insurance system") was "outside influence," [ECF No. 158 at 2–3 (quoting ECF No. 138 at 1)]: Juror #4's letter states that she had come to consider this "story" to be "outside influence" because, at the point of the deliberations that this was raised (which is not clear from the letter), "the verbiage was foreign to [the jury's] deliberations," [ECF No. 138].[1] Dr. Oladipo also asserts that this story was not consistent with the evidence presented at trial, but was consistent with a press release issued on March 22, 2022 and still available online,[2] [ECF No. 158 at 3–4], which when

---

[1] Because these assertions conceivably implicate Rule 606(b)'s exception for juror testimony related to "outside influence," the Court will address them.

[2] The press release states:

> A Canton orthopedic surgeon has been indicted by a federal grand jury in Boston for his role in a health care fraud scheme.

> Dr. Olarewaju James Oladipo, 57, of Canton, was indicted on 11 counts of health care fraud. Oladipo was arrested this morning and will make his initial appearance before U.S. District Court Magistrate Judge Marianne B. Bowler today at 2 p.m. in federal court in Boston.

> According to the indictment, from approximately January 2016 through December 2019, Oladipo devised and executed a scheme to defraud health care benefit programs by falsely billing for patient visits. Specifically, it is alleged that Oladipo used billing codes for more complex—and thus more expensive—services that were not provided (a practice that is sometimes referred to as "upcoding"). Oladipo allegedly falsified medical records of patient visits to reflect examinations and services that were not performed. During the four-year period, it is alleged that

considered with "[t]he apparent fact that a juror utilized this terminology late into deadlocked deliberations[,] suggests strongly that it derived from review of the press release or articles based upon it,"  [id. at 3].  The Court disagrees.

First, the Court repeatedly instructed the jury, in its preliminary instructions, at the end of each trial day, and in its final charge, not to research or consider any outside materials, and "[a] jury is presumed to follow its instructions."  Weeks v. Angelone, 528 U.S. 225, 234 (2000) (quoting Richardson v. Marsh, 481 U.S. 200, 211 (1987)).  Likewise, evidence on this issue was presented at trial.  All of the patients the government put on as witnesses, as well as the undercover agent ("UC"), had been prescribed opioids by Dr. Oladipo and testified about it, including that they continued to see Dr. Oladipo, at least in part, because he freely prescribed the drugs.  This prescribing, their addiction histories, and the limited care that they received from Dr. Oladipo were central to their testimony and could have easily led the jury to infer a pattern and practice.  The government also articulated this theme in both its opening and closing statements. It is hardly surprising that a theme at trial was also referenced in a press release about the case and the fact that trial evidence, consistent with an earlier press release, was discussed in the jury room does not amount to the "clear, strong, substantial and incontrovertible evidence that a

---

Oladipo frequently billed for more than 60 patients per day and sometimes more than 90 patients per day.  The result was that many, if not most, of Oladipo's patient visits on such days could have only lasted five minutes or less.  However, Oladipo allegedly used billing codes that typically corresponded to visits of 15, 25, 30, or even 45 minutes.  *It is further alleged that Oladipo ensured this high flow of patients to his practice by prescribing powerful, highly addictive opioids at a rate that made him one of the top prescribers of such drugs in Massachusetts*.

Press Release, U.S. Attorney's Office, District of Massachusetts, Canton Doctor Indicted for Health Care Fraud (Mar. 22, 2022), https://www.justice.gov/usao-ma/pr/canton-doctor-indicted-health-care-fraud (emphasis added).

specific, nonspeculative impropriety has occurred" as required to warrant a post-verdict inquiry. Connolly, 341 F.3d at 34 (quoting Moon, 718 F.2d at 1234).

Finally, the Court finds that Dr. Oladipo has failed to establish reasonable grounds for a post-verdict inquiry based on racial or ethnic bias. Dr. Oladipo's only explicit argument on this issue is that "Juror #4's statements about name-calling to the point of tears suggest . . . possible racial or ethnic bias during deliberations." [ECF No. 148 at 5]. There is no basis for this assertion. Juror #4 states in her letter and social media communications that there was "name calling and bullying . . . directed towards" her, [ECF No. 138 at 1],[3] but there is nothing that suggests that any conduct was related to race or ethnicity.

The background section of Dr. Oladipo's opening brief also notes that "Dr. Oladipo is a black man who was born in London to Nigerian parents, graduated from medical school in Nigeria and trained in surgery in the United Kingdom before emigrating to the United States and becoming a citizen"; "[t]he deliberating jury consisted of one juror from a minority background"; "[t]his one minority juror, a black woman, was originally an alternate juror but became a deliberating juror after another juror was excused during the course of the trial"; "[d]uring jury selection, the government used a peremptory strike to remove the only qualified black male juror"; and "[t]he Court overruled the defendant's Batson challenge." [ECF No. 148 at 1–2]. The government responds that to the extent that Dr. Oladipo is suggesting that the jury selection

---

[3] See also [ECF No. 138 at 1 ("On Friday morning, I was called a 'Cry Baby . . . .'"); ECF No. 148-2 ("I was ultimately the one in favor of Innocence. It was quite a terrible experience. I'm a little traumatized by it. There were tears, name-calling . . . totally like '12 Angry Men' In there!"); ECF No. 148-3 at 4 ("'12 Angry Men,' a movie that would describe it. . . . There were tears & name calling . . . . Long story short, I was an outlier on so much. I could write a book on what occurred."); id. at 5 ("[T]raumatic is a good word . . . there were days I was deeply shivering from the inside out and couldn't eat. On a positive note, I made some new lifelong friends.")].

process or trial was tainted by racial or ethnic bias, (1) "the record soundly refutes this

argument," as "[t]here was no evidence of racial bias or suggestion of improper argument during

the trial, and no evidence whatsoever of racial bias during the jury's deliberations"; (2) "[t]he

jury was the product of this Court's appropriate jury selection process to ensure a fair and

impartial jury"; (3) "[f]ollowing empanelment, the jury was instructed on the subject of implicit

bias twice — once as part of the Court's preliminary instructions and once during the Court's

final charge to the jury"; and (4) there was no evidence of racial or ethnic bias after the jury

returned its verdict.  [ECF No. 154 at 2–4].

The Court took numerous steps to ensure a fair jury selection process and trial, and finds

no evidence of racial or ethnic bias warranting investigation into the verdict.  During voir dire,

the Court explained that the defendant in this case is a naturalized American citizen of Nigerian

descent, and asked jurors whether they possessed any personal feelings about African people,

Nigerian people, or naturalized citizens that might influence their consideration of the evidence.

No one responded affirmatively.  Dr. Oladipo's observations that there was ultimately only one

minority juror, that the government used one of its peremptory challenges to strike a minority

juror, and the Court, after hearing from both parties, denied Dr. Oladipo's <u>Batson</u> challenge,[4] do

---

[4] After a sufficient number of potential jurors were qualified, the government used one of its peremptory challenges to strike a minority juror.  Dr. Oladipo raised a <u>Batson</u> challenge, and the Court asked for the government to provide its rationale for the challenge.  The government explained that its primary reason for the challenge was the juror's recent, adverse involvement with the criminal justice system.  The government also noted that the juror lives in Randolph (close to where Dr. Oladipo's practice was), and that the government felt that the Court's response to the government's questioning of the juror during voir dire may have given the potential juror a negative impression of the government.  Dr. Oladipo responded that the charges against the juror had been dropped and that other jurors had histories of charges and even convictions.  The Court concluded that the government had provided a race-neutral reason and therefore rejected the <u>Batson</u> challenge.

not warrant a post-verdict inquiry, particularly, given that, as the government points out, the Court granted Dr. Oladipo's motion to strike another potential minority juror for cause.

Likewise, the Court gave extended instructions on implicit bias both in its preliminary instructions and in its final charge.  During deliberations, none of the jury's first five questions had any connection to race or ethnicity.  See [ECF No. 135].  The same is true for the jury's last note, indicating that they had reached an impasse, [id.]. and the Court's modified Allen charge. After the jury returned a verdict, the Court polled the jury, and again there was no indication of any racial or ethnic bias.[5]  Also, contrary to Dr. Oladipo's suggestion, there was no indication during the polling that Juror #4 or any other juror was unhappy or uncomfortable with the outcome.  In sum, the Court finds there is no credible or colorable evidence of racial or ethnic bias and thus no grounds for post-verdict inquiry on this basis.

Finally, the Court denies Dr. Oladipo's request to interview Juror #4.  "[P]ost-verdict contact with jurors is prohibited in the First Circuit generally."  Bouret-Echevarria v. Caribbean Aviation Maint. Corp., 784 F.3d 37, 48 (1st Cir. 2015) (citing United States v. Kepreos, 759 F.2d 961, 967 (1st Cir. 1985)).

> [P]ost-verdict interview[s] of jurors by counsel, litigants or their agents [are prohibited] except under the supervision of the district court, and then only in such extraordinary situations as are deemed appropriate.  Permitting the unbridled interviewing of jurors could easily lead to their harassment, to the exploitation of their thought processes, and to diminished confidence in jury verdicts, as well as to unbalanced trial results depending unduly on the relative resources of the parties.

---

[5] As the government notes, see [ECF No. 154-1 at 4], and as the Court does with all its juries, the Court met briefly with the jury after they had returned their verdict, to thank them for their service.  There was no substantive discussion of the case or the verdict, and, once again, no suggestion of racial or ethnic bias and no visible indication that Juror #4 or any other juror was upset with the outcome.

Kepreos, 759 F.2d at 967.  For many of the same reasons discussed above, the Court finds that this case does not present an "extraordinary situation[]" that requires allowing Dr. Oladipo's counsel to interview Juror #4.  Although her communications may suggest that she may be willing to submit to an interview, this does not outweigh the other policy considerations that counsel against allowing such an interview.

## IV.    CONCLUSION

For the reasons set forth above, Dr. Oladipo's motion, [ECF No. 148], is <u>DENIED</u>.

**SO ORDERED.**

February 16, 2024                                     /s/ Allison D. Burroughs
                                                      ALLISON D. BURROUGHS
                                                      U.S. DISTRICT JUDGE